IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| RODNEY BLACK,<br><br>                   Plaintiff,<br><br>v.<br><br>PERCY MYERS, ALISA DEARMOND,<br>and AIMEE LANG,<br><br>                   Defendants. | Case No. 3:23-CV-190-NJR |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Plaintiff Rodney Black, an inmate at Menard Correctional Center ("Menard") within the Illinois Department of Corrections (IDOC), filed this lawsuit under 42 U.S.C. § 1983 alleging Defendants Dr. Percy Myers, Alisa Dearmond, and Aimee Lang were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. (Doc. 1). The matter is now before the Court on the Motion for Partial Summary Judgment filed by Black (Doc. 84), as well as the Motions for Summary Judgment filed by Defendants. (Docs. 98, 107). For the reasons set forth below, summary judgment is granted to Defendants Dr. Myers and Dearmond, granted in part and denied in part as to Defendant Lang, and denied as to Plaintiff Black.

## BACKGROUND

The following material facts are undisputed, unless otherwise noted, for the purposes of the instant summary judgment motions.[1] In 2022, Dearmond was a nurse

---

[1] Black did not respond to Defendants' motions for summary judgment; therefore, Defendants' facts are

practitioner (NP) employed by Wexford Health Sources, Inc. ("Wexford") at Menard, Lang was a Correctional Medical Technician (CMT) employed by the IDOC at Menard, and Dr. Myers was a physician employed by Wexford. (Docs. 99-2; 99-3; 108-1 at p. 52). Dr. Myers served as a Traveling Medical Director and provided care to patients at Menard when needed. (Doc. 99-3).

Black attended nurse sick call on March 18, 2022. (Docs. 99-2; 99-3; 99-4 at p. 7). He had previously been diagnosed with benign prostatic hyperplasia (BPH), which is a non-cancerous condition that causes the prostate gland to enlarge. (Docs. 99-2; 99-3). Symptoms of BPH include frequency or urgency to urinate, frequent urination at night, trouble urinating, weak urine stream, and inability to empty the bladder. (*Id.*). Black was prescribed Hytrin, a medication used to improve urination in men with BPH, to help with urinary frequency. (Docs. 99-2; 99-3; 99-4 at p. 7). During his sick call visit, Black reported that the Hytrin was not helping him. (Doc. 99-4 at pp. 7, 187). The nurse noted elevated prostate specific antigen (PSA) levels, which can indicate prostate cancer or a non-cancerous prostate condition, and Black was referred to the NP line for further examination. (Docs. 99-2 at p. 2; 99-3 at p. 2).

NP Dearmond saw Black six days later, on March 24, 2022, and called Southern Illinois Healthcare Urology ("SIH Urology") to schedule a cystoscopy with biopsy. (Doc. 99-4 at p 8). NP Dearmond's plan of care was to wait for a call back from SIH Urology. (*Id.*). On March 29, 2022, NP Dearmond called SIH Urology again about

---

deemed admitted except where disputed by Black's own declaration and testimony. SDIL-LR 56.1(g) ("All material facts set forth in a Statement of Material Facts or a Statement of Additional Material Facts shall be deemed admitted for purposes of summary judgment unless specifically disputed.").

scheduling a cystoscopy with biopsy ASAP. (*Id.* at p. 11). The scheduler indicated they would leave a message with the nurse and call NP Dearmond back. (*Id.*). Later that same day, NP Dearmond called SIH Urology again and left a message with the surgery scheduler. (*Id.* at p. 12).

The next day, March 30, 2022, NP Dearmond again called SIH Urology and spoke to the receptionist. (*Id.* at p. 13). NP Dearmond was again told to wait for a call back. (*Id.*). She finally received a call from SIH Urology later that day, and the procedure was scheduled for the following month. (*Id.* at pp. 14, 16).

The cystoscopy with a prostate biopsy and bladder biopsy was completed on April 27, 2022, by Dr. Stokes, a urologist at SIH Urology. (*Id.* at pp. 19, 116). The biopsy revealed benign (non-cancerous) prostatic tissue from the prostate biopsy and benign urothelial tissue from the bladder biopsy. (*Id.*). Black was prescribed tamsulosin, an alpha-blocker medication that treats the symptoms of an enlarged prostate, which also can be used to treat BPH. (Docs. 99-2 at p. 3; 99-3 at p. 3). Another nurse practitioner prescribed the antibiotic Cipro, 500 mg, twice per day for five days. (Doc. 99-4 at pp. 21, 143).

After returning to Menard from SIH Urology, Black could not urinate on his own. (*Id.* at p. 19). He went to the healthcare unit, where his bladder was found to be distended and tender to palpation. (*Id.*). The nurse inserted a foley catheter and a total of 580 mL of urine was released, including bloody urine, which relieved Black of his pain and discomfort. (*Id.*). The nurse's note indicated that education was provided, and Black was returned to his cellhouse. (*Id.*). In a signed declaration, Black stated that he was not given any aftercare instructions, alcohol pads, iodine, white vinegar, or any oral or written

instructions on how to care for urinary retention. (Doc. 84 at p. 2).

The next day, April 28, 2022, Black returned to healthcare again complaining of abdominal pain and urinary retention. (Doc. 99-4 at p. 20). His bladder was "grossly distended" and tender to palpation. (*Id.*). The nurse spoke to Dr. Myers, who ordered a foley catheter insertion. (Doc. 99-3 at p. 4). Upon insertion, over 1000 mL of bloody tinged urine was release. (*Id.*). The nurse also spoke to Dr. Myers about the need for foley placement and/or irrigation. (*Id.*). The nurse continued the foley catheter per Dr. Myers's orders, noting no clots observed, good flow of urine, and no need for irrigation at that time. (*Id.*). The nurse also planned to call the urologist to discuss complications. (*Id.*).

NP Crane reviewed Black's chart on April 29, 2022. (*Id.* at p. 22). She called SIH Urology and spoke to someone who was going to send an urgent message to Dr. Stokes for further orders. (*Id.*). SIH Urology called back the same day and instructed NP Crane to leave the catheter in for one week, as bloody urine and urinary retention are common after the procedure. (*Id.* at p. 23). Dr. Stokes also directed her to extend the prescription for the antibiotic Cipro to 10 days. (*Id.*).

On May 6, 2022, NP Dearmond removed Black's catheter without difficulty. (*Id.* at p. 27). Black attested that NP Dearmond did not make sure he could urinate before sending him back to his cell house. (Doc. 84 at p. 3). The next day, Black returned to healthcare in a wheelchair due to pain while urinating. (Doc. 99-4 at p. 27). Black complained of only being able to urinate a "trickle." (*Id.*). Another catheter was inserted, and 900 mL of urine was released. (*Id.*). The foley catheter remained in place over the weekend until SIH Urology could be contacted. (*Id.* at p. 28).

NP Dearmond called SIH Urology on May 9, 2022, and asked for Dr. Stokes's advice on next steps. (*Id.* at p. 29). A physician assistant at SIH Urology called back the following day and told NP Dearmond to leave the foley catheter in place and replace it every four weeks until Black could be seen by urology. (*Id.* at p. 31).

Black saw the physician assistant at SIH Urology on June 1, 2022. (*Id.* at pp. 35, 124-134). Black's catheter was removed at the visit, and his medications were adjusted. (*Id.*). The urologist also recommended insertion of a foley catheter for one week with bladder training. (*Id.* at p. 38). Black was directed to follow up in three months. (*Id.* at p. 128).

The catheter removal did not last; Black returned to healthcare at 1 a.m. on June 2, 2022, unable to urinate. (*Id.* at p. 39). A catheter was reinserted due to urinary retention. (Doc. 99-3 at p. 6). Dr. Myers confirmed that placement of the foley catheter was appropriate and instructed NP Dearmond to leave the catheter in place if return was greater than 600 mL. (*Id.*). That was the last time Dr. Myers was involved in Black's care. (*Id.*). Because 1000 mL of urine was voided, NP Dearmond left the catheter in place and instructed Black on how to use a catheter bag. (Doc. 99-4 at pp. 36-37). She also made a call to Urology to follow up. (*Id.*).

On June 4, 2022, NP Dearmond reviewed Black's labs that were taken on June 2, 2022, and noted possible epididymitis, a condition that causes inflammation of the epididymis, which is a tube-shaped structure located behind the testicles. (Doc. 99-4 at p. 41; Doc. 99-2 at p. 6). Epididymitis is treated by antibiotics, so NP Dearmond prescribed doxycycline, 100 mg twice per day for 10 days. (Doc. 99-4 at p. 41; Doc. 99-2 at p. 6).

Black was scheduled for a follow up appointment with urology on June 17, 2022,

where he had a urine culture and PSA screening. (*Id.* at p. 150). Additional labs were drawn on June 30, 2022, which indicated a bacterial infection. (*Id.* at pp. 153-54). NP Moldenhauer prescribed Bactrim, twice per day for 10 days, and a repeat of the urine culture in three weeks. (*Id.* at pp. 48, 144).

In July, Black was playing basketball in the yard when his catheter was pulled out. (*Id.* at p. 48; Doc. 99-1 at p. 33). He told a Correctional Officer, who instructed Black to put in a nurse sick call slip. (Doc. 99-1 at p. 33). Black did so. (*Id.* at p. 34). Black testified that when CMT Lang came by his cell while passing out medications, she told Black she "wasn't putting it back in." (*Id.*). Black testified he had to wait 24 hours to have the catheter reinserted. (*Id.*). Black's medical record from July 21 indicates Black was able to urinate on his own for approximately eight hours after the catheter was pulled out, but he was no longer able to urinate independently. (Doc. 99-4 at p. 48). A new catheter was inserted. (*Id.*).

Labs were drawn again on August 4, 2022. (*Id.* at pp. 50, 155-56). NP Crane planned to call Black over to discuss the results and options, including a prescription for Levaquin. (*Id.* at pp. 53, 145). Black returned to NP Dearmond on August 10, 2022, to discuss his urinary tract infection ("UTI"). (*Id.* at p. 55). NP Dearmond noted that Black needed to start on Levaquin, and she had him sign a consent form. (*Id.* at p. 55; Doc. 99-1 at p. 57). NP Dearmond further discussed the treatment plan and explained that Black would begin bladder training once the UTI resolved. (Doc. 99-4 at p. 55).

On August 12, 2022, NP Crane reviewed Black's labs from August 4, 2025, which showed no UTI. (*Id.* at p. 56). Thus, she discontinued the Levaquin prescription. (*Id.*).

CMT Lang told Black that the Levaquin prescription was canceled. (Doc. 99-1 at p. 58). CMT Lang is not licensed to prescribe medications and does not have the authority to cancel medications that have been prescribed. (Doc. 108-2).

Additional lab work was completed on August 25, 2022, including a lipid panel, urine culture, and urinalysis. (*Id.* at pp. 157-58). NP Dearmond reviewed the lab results on August 30, 2022, and noted abnormal results. (*Id.* at p. 59). NP Dearmond prescribed Cipro twice per day for 10 days and directed that the foley catheter should remain in place until Black saw the urologist the following week. (*Id.*).

On September 7, 2022, Black again saw NP Dearmond and voiced concerns about his urinary retention and the replacement of his foley catheter. (*Id.* at p. 62). NP Dearmond placed him on the treatment board for a catheter change. (*Id.* at p. 62). She also advised Black that he was scheduled for a urology follow-up that week, but it had been canceled by the urologist. (*Id.* at p. 63). The appointment was rescheduled for October 2022. (*Id.* at p. 62). NP Dearmond further discussed removal of the catheter with bladder training, but Black indicated he would rather keep the foley catheter in place until he saw the urologist. (*Id.* at p. 63).

Black alleges that on September 16, 2022, he went to the healthcare unit to have his catheter changed, but CMT Lang told him there were no catheters available. (Doc. 99-1 at p. 58). Black further testified that he could not say whether CMT Lang was lying, but she always had someone else change his catheter. (*Id.* at p. 59). On the occasions when she did change it, he testified, there would always be a problem with it—like blood coming out or it not being placed correctly. (*Id.* at p. 60).

Black had his catheter replaced on September 18, 2022, October 9, 2022, and November 9, 2022, and December 24, 2022. (*Id.* at pp. 65, 68, 76).

In October 2022, Black told CMT Lang he wanted some labs done, but she told him they would be conducted at his urology appointment. (Doc. 99-1 at pp. 60-61). CMT Lang is not licensed to order lab testing for an individual in custody. (Doc. 108-2).

On October 14, 2022, Black's urine tested positive for a UTI, but otherwise Black had no complaints of pain, discomfort, or UTI symptoms. (Doc. 99-4 at pp. 69-70, 73, 149). Meanwhile, SIH Urology delayed Black's appointment to December 8, 2022. (*Id.* at p. 72).

NP Dearmond attested that the urologist's recommendation was to replace Black's catheter every four weeks and that the Cleveland Clinic's recommendation is to change a foley catheter at least every three months. She further attested that she instructed Black on how to keep his catheter clean and in place. (Doc. 99-2 at pp. 10-11). She was not involved with the timing or cancellation of appointments at SIH Urology. (*Id.*). At no time relevant to this case did Black develop a staph infection.[2] (Doc. 99-2 at p. 10).

Black filed this lawsuit on December 16, 2022, alleging an Eighth Amendment deliberate indifference claim. (Doc. 1). Black asserts that, despite having complaints of urinary retention, Dr. Myers merely ordered that Black's catheter be replaced rather than seeking the cause of his bladder issues. (Doc. 19). As a result, Black continued to have issues with urinary retention, and the continuous removal and replacement of the

---

[2] In Black's Motion for Summary Judgment, he attests that he went to the Emergency Room for sepsis due to an infection caused by his foley catheter in August 2023. (Doc. 86 at p. 6). He also states that in May 2024, he spent three days in the hospital clinging to life with sepsis from his catheter. (*Id.*). These alleged events occurred after Black filed this case and, thus, are not part of his Complaint. (*See* Doc. 1). Furthermore, Black does not associate these events with any actions or inaction by the named Defendants.

catheter resulted in scarring and infections. (*Id.*). Black asserts that NP Dearmond canceled his prescribed antibiotics for a staph infection in August 2022 and also delayed ordering labs, getting results, and providing antibiotics at other times, resulting in him having staph infections. (*Id.*). She also did not change the catheter in the required time, allowing Black to go well over 30 days before receiving a new catheter. (*Id.*). Finally, Black asserts that he had to write several sick call slips before CMT Lang would refer him to NP Dearmond for his infections. (*Id.*). He also claims that CMT Lang delayed changing his catheter, refused to order labs, and refused to put his catheter back in on July 20, 2022. (*Id.*). Black alleges these delays led to infections and delays in receiving treatment.

Black filed a motion for summary judgment on November 18, 2024 (Doc. 84), and Defendants timely responded (Docs. 104, 110). Dr. Myers and NP Dearmond filed their motion for summary judgment on February 13, 2025 (Doc. 98), and CMT Lang filed a motion for summary judgment on March 20, 2025 (Doc. 107). As noted above, Black did not respond to Defendants' motions.

## LEGAL STANDARD

Summary judgment is appropriate where there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). In determining whether a genuine issue of fact exists, the Court views the evidence and draws all reasonable inferences in favor of the non-moving party. *Ziccarelli v. Dart*, 35 F.4th 1079, 1083 (7th Cir. 2022). Once the moving party sets forth the basis for summary judgment, the burden shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial.

FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). A moving party is entitled to judgment as a matter of law where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323.

## DISCUSSION

"The Eighth Amendment proscribes 'deliberate indifference to serious medical needs of prisoners' amounting to 'the unnecessary and wanton infliction of pain.'" *Arce v. Wexford Health Sources Inc.*, 75 F.4th 673, 678–79 (7th Cir. 2023) (quoting *Stockton v. Milwaukee County*, 44 F.4th 605, 614 (7th Cir. 2022)). "Deliberate indifference requires '[s]omething more than negligence or even malpractice.'" *Id.* at 679 (quoting *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)). To succeed on an Eighth Amendment deliberate indifference claim, a plaintiff must show: (1) he suffered from an objectively serious medical condition; and (2) the individual defendant was deliberately, that is subjectively, indifferent to that condition. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019).

A medical condition is objectively serious if "a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (citation omitted). It is not necessary for a condition to "be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010); *accord Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (violating the Eighth Amendment requires "deliberate indifference to a *substantial* risk of *serious* harm") (internal quotation marks omitted) (emphasis added).

Defendants do not dispute that Black had a serious medical condition, so the Court turns to the subjective prong.

Prevailing on the subjective prong requires a plaintiff to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *Id.* at 653. The plaintiff need not show the individual "literally ignored" his complaint, but that the individual knew of the condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). "Something more than negligence or even malpractice is required" to prove deliberate indifference. *Pyles v. Fahim*, 771 F.3d 403, at 409 (7th Cir. 2014). The defendant must have had "actual, personal knowledge of a serious risk, coupled with the lack of any reasonable response to it." *Ayoubi v. Dart*, 724 F. App'x 470, 474 (7th Cir. 2018). Proving deliberate indifference "is a high bar 'because it requires a showing [of] something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (quoting *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012)).

I.   **NP Dearmond and Dr. Myers's Motion for Summary Judgment**

NP Dearmond argues she was not deliberately indifferent to Black's medical needs when the evidence shows she continually treated his urological issues. NP Dearmond contends that she made repeated attempts to schedule the cystoscopy and biopsies with SIH Urology, she followed up with the urologist when needed, she constantly changed Black's catheter in conformity with the recommended guidelines, and when Black showed symptoms of an infection, she prescribed antibiotics to treat it.

The Court agrees with NP Dearmond. The record belies Black's claim that she

delayed prescribing antibiotics when he had an infection. For example, Black had labs drawn on June 2, 2022, and the results were reviewed by NP Dearmond just two days later. Noting signs of possible epididymitis, NP Dearmond prescribed doxycycline. Black also had labs drawn on August 25, 2022, which NP Dearmond reviewed on August 30, 2022. Upon review, she prescribed the antibiotic Cipro. Despite Black's allegations to the contrary, he never had a staph infection during the relevant time period. And it was NP Crane, not NP Dearmond, who canceled his prescription for Levaquin when NP Crane realized his labs showed no active UTI.

Black has also failed to set forth any evidence to contradict NP Dearmond's evidence that foley catheters should be changed at least every three months and that his catheter was changed nearly every month. At most, Black went 43 days without a catheter change, which is still well below the recommended three months. There is simply no evidence from which a rational jury could conclude that NP Dearmond knowingly or recklessly disregarded an excessive risk to Black's health. Summary judgment will be granted in her favor.

The Court also finds that Dr. Myers is entitled to summary judgment. Black has not set forth any evidence to show that Dr. Myers was deliberately indifferent to his urinary retention and infections. In fact, the evidence reveals the contrary. On April 28, 2022, Dr. Myers provided prompt medical orders via telephone to insert a foley catheter, which released Black's urine and provided him with relief. When Dr. Myers was consulted again on June 2, 2022, he confirmed that placement of the foley catheter was appropriate and directed the nurse to leave the catheter in place if the urine return was

greater than 600 mL, which it was. To the extent Black claims that Dr. Myers merely ordered his catheter to be replaced rather than seeking the cause of his bladder issues, the evidence is well established that SIH Urology was regularly consulted as to Black's urological problems, and that Black was scheduled for follow up appointments at SIH Urology. The fact that Black's appointments were pushed back by the urologist has no bearing on his claims against Dr. Myers. Dr. Myers is entitled to summary judgment.

## II.  CMT Lang's Motion for Summary Judgment

CMT Lang likewise asserts she is entitled to summary judgment because the evidence is clear that Black was continually treated for medical issues related to his catheter. She argues there are no medical records showing that she refused to put Black's catheter back in—or any interaction between them whatsoever—on July 20, 2022. Even accepting Black's allegations as true, however, CMT Lang contends that any delay caused by her does not rise to the level of deliberate indifference. As to Black's claim that she told him on September 16, 2022, that there were no catheters in the healthcare unit, Black testified that he had no reason to believe CMT Lang was lying and that Lang does not order supplies for the facility. Finally, with regard to Black's allegation that CMT Lang would not order labs for him in October 2022, the evidence demonstrates that CMT Lang is not licensed to order labs for a person in custody, there is no record of Black seeing CMT Lang in October 2022, and Black indeed had labs taken on October 20, 2022.

The Court agrees that there is no evidence that CMT Lang had any authority to order supplies for the facility or to order lab work for Black. And Black agreed he has no reason to think CMT Lang was lying in September 2022 when she said there were no

catheters available. The Court finds no deliberate indifference with regard to these allegations.

The Court cannot say the same regarding the alleged encounter on July 20, 2022. Black testified that CMT Lang was his "primary person" when it came to his catheter. (Doc. 99-1 at pp. 53-57). He explained that he went to her any time his bag leaked, his catheter came out, or there was a problem with his catheter. (*Id.*). When his catheter was pulled out while playing basketball, he was told to put in a sick call slip, which he did. Black testified that Lang wouldn't call him to sick call. (*Id.*). Then, nearly 12 hours after his catheter came out, Black stopped CMT Lang as she came by to pass out medications. (*Id.*). Black testified that he was "freaking out" because he had been drinking water and he had the urge to urinate but he couldn't, which caused him severe pain. (*Id.*). When Black told CMT Lang his catheter was out, she said "I'm not putting it back in." (*Id.*). Black then had to wait another 12 hours—24 hours total—to have his catheter reinserted. Black testified that going 24 hours without a catheter made him feel like his bladder would explode. (*Id.*).

CMT Lang argues there is no medical record of an encounter with Black on July 20, 2022, but of course there is none. Black claims she refused to call him for sick call, and he told CMT Lang about his catheter while she was walking through the cell house and handing out medications. And although CMT Lang attested that she never refused to place a catheter for Black, Black's testimony to the contrary is also competent evidence.

When viewing this evidence and all reasonable inferences in favor of the non-movant, the Court finds that summary judgment is not appropriate. A jury crediting

Black's testimony could find CMT Lang exhibited deliberate indifference when she had actual, personal knowledge of a serious risk to Black's health and that she literally ignored his complaints by refusing to call him for sick call or to reinsert his catheter. As a result of her inaction, Black suffered severe pain and felt as if his bladder would explode. Thus, summary judgment will not be granted to Lang on this claim.

*Qualified Immunity*

CMT Lang also argues she is entitled to qualified immunity. "Qualified immunity shields a government official from suit for damages under § 1983 'when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted.' " *Sabo v. Erickson*, 128 F.4th 836, 843 (7th Cir. 2025) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). Qualified immunity applies when (1) the official violated a statutory or constitutional right, and (2) the right was not "clearly established" at the time of the challenged conduct. *Id.* A constitutional or statutory right is "clearly established" when the law is "sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Id.* at 843-44 (cleaned up and citation omitted).

Here, Black has set forth evidence that, if credited by the finder of fact, establishes a violation of his Eighth Amendment rights. Moreover, "[t]he general standard for liability under the Eighth Amendment for refusal to treat a serious medical condition was well-established" when CMT Lang refused to reinsert his catheter. *See Walker v. Benjamin*, 293 F.3d 1030, 1040 (7th Cir. 2002). Thus, CMT Lang is not protected by qualified immunity.

### III. Black's Motion for Summary Judgment

After providing his declaration and statement of facts, Black argues he is entitled to summary judgment because, before his cystoscopy with biopsies, he could urinate on his own. Afterward, he could not urinate on his own. And in the minutes, hours, and days immediately after his cystoscopy, Dr. Myers was "personally in charge" of his situation. (Doc. 84). Moreover, Black avers, the removal and replacement of the catheter caused scarring and inflammation, and he had to fight to get labs to diagnose UTIs and staph infections. (*Id.*).

Despite Black's argument to the contrary, the evidence in the record shows that Dr. Myers was not personally responsible for any damage done by the cystoscopy or biopsies. Nor is there any evidence, either in the medical records or in Black's testimony, to support his claims that he had scarring and inflammation as a result of his catheter. Moreover, the record is replete with evidence of lab work that was done on nearly a monthly basis. To the extent Black wanted more labs taken, "a prisoner may not dictate his own course of treatment." *Page v. Obaisi*, 318 F. Supp. 3d 1094, 1103 (N.D. Ill. 2018). Finally, as to Black's contention that CMT Lang refused to replace his catheter after it came out in June 2022, the Court finds there is a genuine issue of material fact that precludes summary judgment for either party. Thus, Black's motion is denied.

### CONCLUSION

For these reasons, the Motion for Summary Judgment filed by Defendants Percy Myers and Alisa Dearmond (Doc. 98) is **GRANTED**. These Defendants are **DISMISSED with prejudice**.

The Motion for Summary Judgment filed by Defendant Aimee Lang (Doc. 107) is **GRANTED in part and DENIED in part**.

The Motion for Partial Summary Judgment filed by Plaintiff Rodney Black (Doc. 84) is **DENIED**.

Plaintiff Rodney Black shall proceed on his claim that Defendant Aimee Lang was deliberately indifferent in violation of the Eighth Amendment when she refused to reinsert his catheter in July 2022.

**IT IS SO ORDERED.**

DATED:   September 22, 2025

*[signature: Nancy J. Rosenstengel]*

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**